IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA )
)
v. ) Case No. 3:19cr138–HEH
)
SAMUEL LEE MURCHISON, )
)
Defendant. )

## MEMORANDUM OPINION
(Defendant's Motion to Suppress Evidence)

Defendant's Motion to Suppress evidence emanates from a traffic stop in the 900 block of St. Paul Street in Richmond, Virginia, on the evening of November 5, 2018. The 900 block of St. Paul Street is located in a development called Gilpin Court, and is known by the Richmond City Police as an area where violent crime and firearms are frequently encountered. The underlying traffic stop was occasioned by a defective tag light which only partially illuminated Defendant's license plate. The resulting encounter led to the seizure of a firearm and a quantity of cocaine from Defendant.

This case is presently before the Court on Defendant's Motion to Suppress both items (ECF No. 12). He contends that Richmond City police officers had no justification to either stop his vehicle or pat him down for weapons. Both Defendant and the United States have filed memoranda supporting their respective positions, and the Court heard evidence and oral argument on November 21, 2019.

The evidence revealed that Richmond Police Officers Patricia Bruington and Patrick Digirolamo observed Defendant's vehicle in the 900 block of St. Paul Street on

the evening of November 5, 2018. Their attention was drawn to the vehicle because the license plate was not clearly visible from at least 50 feet behind the vehicle, as required by Virginia law. It was apparent to the officers that only one of the two tag lights was illuminated. The other appeared to be defective or not functioning. Both officers were wearing body cameras, which captured their actions that followed. When the officers alighted from the vehicle, Officer Digirolamo approached the driver's side of Defendant's vehicle, and Officer Bruington approached the passenger side. When Officer Digirolamo requested identification, Defendant complied. The officer then asked a number of follow-up questions—Defendant's address and whether there were any weapons or drugs in the car. Defendant denied the presence of any drugs or weapons in the car. Officer Digirolamo then asked if Defendant would permit the officers to quickly check his vehicle. Defendant declined, responding that it was not his car.

Meanwhile, Officer Bruington shined her flashlight into Defendant's vehicle to ensure that there were no weapons. Her attention was drawn to what appeared to be something black and metallic protruding from Defendant's right pocket. She described it as a large bulge. (Hr'g Tr. at 10:12–11:4, ECF No. 18 (hereinafter "Tr.").) Officer Bruington asked Officer Digirolamo to ask Defendant what was in his right pants pocket. Defendant replied "keys and stuff." (*Id.* at 12:9–16.) Officer Digirolamo asked Defendant to remove the keys from his pocket, and Defendant complied. Officer Bruington testified that her flashlight still illuminated a metallic object in the pocket. (*Id.* at 12:24–13:4.) Both officers stated that during the encounter, Defendant was leaning in a position which appeared to be concealing his right pocket. (*Id.* at 14:4–9, 52:18–53:1.)

When the officers asked Defendant to remove the other items in his pocket, he refused and claimed that they had pulled him over for no reason. Officer Digirolamo replied that the officers just wanted to know what was in the right pocket. Officer Bruington then concluded that they needed to conduct what they called a protective sweep, and Officer Digirolamo removed Defendant from the vehicle.

Officer Digirolamo testified that Defendant's body movements were suggestive of concealment. (*Id.* at 52:1–5; 52:18–53:1.) He also noticed what appeared to be a bulge in Defendant's right pocket. He concurred that Defendant should be removed from the vehicle and patted down for the officers' protection. Officer Digirolamo then opened the driver's side door of the vehicle and assisted Defendant in stepping out. He testified that the decision to remove Defendant from the vehicle was based on the bulge in his right pocket coupled with what he described as a "blading" movement to conceal the right part of his body. (*Id.* at 53:12–21.)

As Defendant alighted from the vehicle, both officers advised him that he was not in trouble, and that their sole objective was to ensure that there were no weapons. After Defendant was handcuffed, Officer Digirolamo testified that he placed his right hand along the side of Defendant's pants with an open palm. As he slid his hand down Defendant's pant leg, he felt something heavy and believed it to be a firearm. The officer pushed his hand up Defendant's pocket revealing the muzzle of a firearm.

After determining that Defendant was a prior convicted felon, he was placed under arrest. Incident to arrest, Officer Bruington conducted a search of Defendant that revealed a cell phone and a baggie, which was later determined to contain crack cocaine.

3

During the evidentiary hearing, portions of the body camera videos were placed into evidence. Both sides argued that the videos supported their position on the motion.

Defendant's challenge begins with the initial stop of his vehicle. He argues that Virginia Code Ann. § 46.2-1013 governing rear tail lights does not apply to tag lights. In his view, the statute only requires the rear tail lights to illuminate license plates sufficiently to make them readable 50 feet from the vehicle. Consequently, Defendant contends that the officer had no reason to stop his vehicle.

Officer Bruington stated that it was her understanding that all lights on a motor vehicle must be operable. In this case, she testified that with the right tag light out, she could not read the tag from 50 feet, as required by law. (*Id.* at 7:25–8:24.)

Section 46.2-1013 of the Virginia Code reads as follows:

> Every motor vehicle and every trailer or semitrailer being drawn at the end of one or more other vehicles shall carry at the rear two red lights plainly visible in clear weather from a distance of 500 feet to the rear of such vehicle. Such tail lights shall be constructed and so mounted in their relation to the rear license plate as to illuminate the license plate with a white light so that the same may be read from a distance of 50 feet to the rear of such vehicle. Alternatively, a separate white light shall be so mounted as to illuminate the rear license plate from a distance of 50 feet to the rear of such vehicle. Any such tail lights or special white light shall be of a type approved by the Superintendent [of the Virginia Department of State Police]. . . .

Officer Bruington's construction of Virginia law is consistent with that of the Circuit Court of the City of Richmond and the Court of Appeals of Virginia. In *Lewis v. Commonwealth of Virginia*, the Court of Appeals of Virginia affirmed a lower court's rejection of the same argument advanced by Defendant in the immediate case. No. 1089-16-2, 2017 Va. App. LEXIS 272 (Va. Ct. App. Oct. 31, 2017) (unpublished) (reviewing

4

an appeal from the Circuit Court of the City of Richmond). "We disagree with appellant's assertion that Code § 46.2-1013 does not mandate a certain number of lights to achieve its purpose of illuminating a license plate." *Id.* at 8 (quotations omitted). Relying on *Otey v. Commonwealth*, 735 S.E.2d 255 (Va. Ct. App. 2012), the appellate court noted that in order "to pass inspection under the Virginia Administrative Code, a vehicle's rear light assembly must 'work as designed by the manufacturer,' and all rear lamps must be 'in operating condition.'" *Id.* at 9 (quoting *Otey*, 735 S.E.2d at 258). The court in *Lewis* therefore concluded that "if a vehicle is equipped with two license plate lights, both must function properly." *Id.* Therefore, in this case, the officers' observation of a defective tag light on the vehicle being operated by Defendant justified the traffic stop for equipment violation.[1]

Defendant next argues that the officers could not have reasonably believed that Defendant was armed and dangerous to justify a patdown, if a patdown occurred at all. In *Arizona v. Johnson*, the Supreme Court held that

> [I]n a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. . . . [Then] [t]o justify a patdown of the driver or a passenger during a traffic stop, . . . just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous.

---

[1] Even if the officers' construction of Virginia law had been technically incorrect, their interpretation was objectively reasonable. *Heien v. North Carolina*, 574 U.S. 54, 67–68 (2014). However, unlike in *Heien*, the statute in question has been construed by the Court of Appeals of Virginia consistent with the officers' testimony.

5

555 U.S. 323, 327 (2009). As discussed above, the first condition has been met. The Court now turns to the second condition—whether Officers Bruington and Digirolamo had reasonable suspicion that Defendant was armed and dangerous justifying them to conduct a frisk.

Reasonable suspicion is an objective standard, and the Court considers "the 'totality of the circumstances' to determine if the officer had a 'particularized and objective basis' for believing that the detained suspect might be armed and dangerous," in deciding whether reasonable suspicion exists. *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "A host of factors can contribute to a basis for reasonable suspicion, including the context of the stop, the crime rate in the area, and the nervous or evasive behavior of the suspect. A suspect's suspicious movements can also be taken to suggest that the suspect may have a weapon." *Id.* Importantly, "[b]ased on the inordinate risk of danger to law enforcement officers during traffic stops, observing a bulge that could be made by a weapon in a suspect's clothing reasonably warrants a belief that the suspect is potentially dangerous, even if the suspect was stopped only for a minor violation." *United States v. Baker*, 78 F.3d 135, 138 (4th Cir. 1996) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977)). While one factor on its own may be insufficient, multiple factors may be combined to create reasonable suspicion. *See George*, 732 F.3d at 300.

This Court concludes that, under the totality of circumstances, the officers had reasonable suspicion, based on objective and particularized facts, that Defendant was armed and dangerous.

First, the stop occurred in Gilpin Court, a high-crime area, as the officers testified. Officer Bruington stated that she patrols that area often, understands the particular problems and issues that occur there, and that Gilpin Court is a high crime area, with "a large amount of violent crime," including crime involving firearms. (Tr. 5:25–6:15.) Officer Digirolamo testified that he has patrolled Gilpin Court since he began at the police department, and that "[i]t's a high drug and violent crime area" and the violent crime "more than likely" includes firearms. (*Id.* at 45:12–21.) He further stated that it "was [his] main job" to respond to calls regarding firearms in that area, and did so "at least once or twice a week." (*Id.* at 45:22–25.) Finally, defense counsel seemingly conceded the dangerousness of the area, stating "yes, it's Gilpin Court. I get the high crime area stuff . . . . (*Id.* at 78:7–8.)

"[A]lthough general evidence that a stop occurred in a high-crime area, standing alone, may not be sufficiently particularized to give rise to reasonable suspicion, it can be a contributing factor." *George*, 732 F.3d at 300; *see also United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993) ("While the defendant's mere presence in a high crime area is not by itself enough to raise reasonable suspicion, an area's propensity toward criminal activity is something that an officer may consider."). Furthermore, the fact that this stop occurred in the evening is another factor to be considered. *See George*, 732 F.3d at 300 ("Likewise, that the stop occurred late at night may alert a reasonable officer to the possibility of danger."). Thus, the fact that the stop occurred in a high-crime area at night contributes to the finding of reasonable suspicion.

Second, Defendant's furtive behavior and movements indicated to the officers that he was carrying a weapon. The video depicts Defendant turning his back almost entirely away from Officer Digirolamo to reach for his identification, which Officer Digirolamo confirmed at the hearing. (Tr. 49:4–7.) Officer Digirolamo testified that "[i]n [his] training and experience, that's a very uncommon way to get your license out of your pocket," stating that he had only seen that one other time "where in the same situation they were concealing something." (*Id.* at 49:8–18.) After Officer Digirolamo asked Defendant what was in his right pocket, Defendant again turned almost entirely away from Officer Digirolamo, who testified that he believed Defendant was "trying to conceal something from [him]." (Id. at 51:18–52:5.) After removing his keys, the officers told Defendant that there was still something in that pocket, upon which Defendant responded by leaning up in his seat. (*Id.* at 52:14–16.) Officer Digirolamo specifically testified that "at that point [he] knew there was something else in that right pocket" and could "see what was a bulge because [Defendant] was leaning back, so [he] tried to put [his] flashlight, as you can see in the video, to see closer what that bulge was, and then [Defendant] just leaned up so [he] couldn't see it." (*Id.* at 52:18–23.) He also testified that he thought Defendant leaned that way to conceal the bulge in his pocket. (*Id.* at 52:18–53:1.)

Officer Bruington testified that after Officer Digirolamo asked Defendant a second time what was in his pocket, "he leaned forward and stated he had nothing left in his pocket. He asked more questions about why we stopped him as if to change the subject." (*Id.* at 13:12–18.) She further stated that Defendant "was evasive in his body language

8

when [they] asked him about what was in his pocket" and "he leaned forward as if to try to conceal it." (*Id.* at 14:7–9.) Such collective behavior contributes to a finding of reasonable suspicion.

Third, and perhaps most importantly, the officers noticed a "large bulge" in Defendant's pocket. (*Id.* at 14:5–6; 52:17–23.) Officer Bruington, in particular, with her flashlight trained on Defendant, also "witnessed a black metallic looking object sticking out of the pocket." (*Id.* at 9:16–10:19, 14:4–5.) Officer Bruington still saw that black metallic object remaining in Defendant's pocket after he removed his keys. (*Id.* at 12:9–13:1.) Officer Bruington testified that, based on her training and experience, she had reason to believe that there was a firearm in Defendant's pocket due to Defendant's evasive behavior and the bulge in his pocket. (*Id.* at 13:19–14:9.) On cross-examination, Officer Bruington further testified that, in reviewing the video, she believed that she saw the magazine of the gun protruding from Defendant's pocket. (*Id.* at 29:23–30:1.)

Officer Bruington also testified that although she told Defendant that she was unsure if the bulge was a gun or a phone, "normally with citizens, to kind of keep them calm in that situation, [she] kind of explain[s] to them, hey, this is just for safety reasons. And [she] relay[s], hey, we don't know if it's a phone or if it's a gun." (*Id.* at 22:20–23:7.) Despite this statement to Defendant, Officer Bruington testified that she "had very good reason to believe that it was a gun." (*Id.* at 23:14–18.) Officer Digirolamo also testified that after Defendant removed his keys but before he leaned forward, he also could see a bulge in Defendant's pocket. (*Id.* at 52:14–23.) He further testified that "for [their] safety," they wanted to conduct a protective sweep. (*Id.* at 53:14–17.)

9

Thus, under the totality of circumstances—particularly given the officers' observations of a bulge in Defendant's pocket, and a black and metallic object protruding out of it—this Court concludes that the officers had reasonable suspicion, based on particularized and objective facts, that Defendant was armed and dangerous.

Defendant next argues that, even if the officers had reasonable suspicion to conduct a patdown, the officers' search for the firearm was unreasonable. Relying on the Supreme Court's decision in *Sibron v. New York*, 392 U.S. 40 (1968), and the Second Circuit's decision in *United States v. Casado*, 303 F.3d 440 (2d Cir. 2002), Defendant contends that the officers did not search Defendant's outer clothing but instead immediately reached into Defendant's pocket in violation of *Terry v. Ohio*, 392 U.S. 1 (1968).[2]

Defendant largely relies on the videos from the officers' body cameras. However, the videos do not fully and clearly depict the frisk the officers conducted. In particular, the videos are not fully focused and trained on the officers' search, nor their hand placement, throughout the entirety of the patdown. Thus, the Court finds it cannot rely solely on these videos.

However, both officers testified that Officer Digirolamo conducted a patdown of Defendant's outer clothing with the palm of his hand. Officer Bruington testified that she saw Officer Digirolamo brush down the side of Defendant's pocket and then push the gun

---

[2] In both *Sibron* and *Casado*, the officers failed to conduct a patdown before reaching into the suspects' pockets, and both courts ultimately held that the searches were unreasonable. *See Sibron*, 392 U.S. at 45, 65–66; *Casado*, 303 F.3d at 442, 449. However, as discussed below, the officers in this case testified that a patdown did precede the search of Defendant's pocket.

out of the pocket when he slid his hand back up. (Tr. 15:18–16:18, 39:25–40:2.) She stated that this was consistent with her training as to patdowns. (*Id.* at 16:19–17:7.) Officer Digirolamo testified that, with his palm open, he placed his hand against the side of Defendant's pocket and slid his hand down the pant leg. (*Id.* at 54:2–15.) He testified that he felt something heavy, which he believed to be a firearm, based upon his training and experience. (*Id.* at 54:16–18.) He testified that he then "put [his] hand on the outside of his pocket to force it up because it was a large pocket," and then he pulled the firearm out. (*Id.* at 54:19–24.)

Based on the officers' testimony that Officer Digirolamo performed a patdown, with an open palm, on the outside of Defendant's clothing before pulling the firearm out of his pocket, this Court finds that the officers complied with *Terry* and its progeny by performing a proper—and justified—frisk prior to reaching into Defendant's pocket to remove the firearm. *See Johnson*, 555 U.S. at 326, 330 ("In a pathmarking decision, *Terry v. Ohio*, the Court considered whether an investigatory stop (temporary detention) and frisk (patdown for weapons) may be conducted without violating the Fourth Amendment's ban on unreasonable searches and seizures. . . . Recognizing that a limited search of outer clothing for weapons serves to protect both the officer and the public, the Court held the patdown reasonable under the Fourth Amendment." (citation omitted)). Officer Digirolamo limited the frisk and the search to Defendant's pocket, where the officers had seen—and later felt—the black and metallic object. He testified that he believed the object was a firearm based on this patdown, and consequently, removed it.

11

The Court finds that Officer Digirolamo's actions were reasonable under the Fourth Amendment.

Accordingly, this Court finds that the search that uncovered the firearm did not violate Defendant's Fourth Amendment rights.

The final issue before the Court is whether the officers' removal of the baggie containing crack cocaine was unreasonable, which was removed subsequent to the officers' discovery of the firearm and Defendant's arrest for possession of a firearm by a convicted felon. As defense counsel conceded at the hearing, this search "stands or falls on whether this initial search [of the firearm] was proper." (Tr. 76:15–17.) The officers conducted the search of Defendant that unveiled the baggie after he was arrested. (*Id.* at 17:8–18:2.) Because this Court finds that the search for the firearm was proper, the arrest was also properly executed. Accordingly, the subsequent search revealing the drugs located on Defendant's person was reasonable as a search incident to arrest. *See United States v. Currence*, 446 F.3d 554, 556 (4th Cir. 2006) ("It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment. This exception provides that when law enforcement officers have probable cause to make a lawful custodial arrest, they may—incident to that arrest and without a warrant—search the arrestee's person and the area within his immediate control." (internal citations and quotations omitted)).

Therefore, for the foregoing reasons, the Court finds that the officers' actions, as challenged, were reasonable under the Fourth Amendment. Accordingly, Defendant's Motion to Suppress will be denied.

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
Senior United States District Judge

Date: Dec. 13, 2019
Richmond, VA